United States District Court
Southern District of Texas
**ENTERED**
May 12, 2021
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| NICHOLE SCOGGINS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-19-2709 |
| | § | |
| CHI ST. LUKE'S HEALTH-BRAZOSPORT, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Magistrate Judge in this case that has been referred for all pre-trial proceedings is defendants Defendant's Motion for Summary Judgment (Document No. 32). Having considered the Motion for Summary Judgment, Plaintiff's Response, Defendant's Reply, the summary judgment evidence, and applicable law, the Magistrate Judge RECOMMENDS, for the reasons set forth below, that Defendant's Motion for Summary Judgment be GRANTED.

## I.    Background

This is an employment discrimination case brought by Plaintiff Nicole Scoggins against her former employer, Chi St. Luke's Health Brazosport ("St. Lukes"), after she was terminated on July 10, 2017, for allegedly violating company policies. Scoggins alleges that her termination was not as a result of any company policy violation, but rather, that St. Luke's discriminated against her based on her disability (obesity and mobility issues related thereto) as well as the Family Medical Leave Act ("FMLA") leave she took in early 2017 for a surgical procedure and the recovery related thereto. Scoggins' factual allegations, and the premise upon which her claims is based, revolve around her relationship with her immediate supervisor, Shannon Haltom, and the complaints she

made both before and after her surgery and FMLA leave about Shannon Haltom to Human Resources ("HR") personnel in both Lake Jackson, Texas, where Defendant is located, and Houston, Texas.  According to Scoggins, she initially told Laurie Green, a HR generalist, about her need for FMLA leave because she felt uncomfortable raising the issue with Haltom.  Scoggins further alleges that when she did tell Haltom on January 31, 2017 about her FMLA leave, which would begin in mid-February, Haltom wanted to know why Scoggins needed FMLA leave and what procedure she was having.  Scoggins did not tell Haltom what procedure she was having, but her FMLA leave was nonetheless approved, and Scoggins was on FMLA leave from February 14, 2017, to March 30, 2017.  Prior to the approval of the FMLA leave, Scoggins alleges she discussed with Laurie Green how Haltom was creating a hostile work environment for her.  Scoggins later told Kelly Johnson, an HR representative in Houston, in an email dated February 23, 2017, about how Haltom was disparaging, belittling, and condescending.

Scoggins had surgery on February 14, 2017, and was out on FMLA leave through March 30, 2017, at which time she was released by her doctor to return to work without any restrictions.  While on leave Scoggins communicated by both email and phone with Johnson about Haltom. Scoggins alleges that when she returned to work on March 31, 2017, Haltom's conduct towards her was worse.  Scoggins again discussed Haltom with Laurie Green on June 6, 2017.  On July 10, 2017, upon Scoggins' return from vacation leave, Scoggins was terminated in a meeting held between her, Laurie Green and Haltom. The basis for the termination was Scoggins' violation of several company policies.

Scoggins brings claims against St. Luke's for violations of the Americans with Disabilities Act ("ADA"), retaliation under the ADA, FMLA interference, and FMLA retaliation.  Defendant

seeks summary judgment on all those claims, arguing that Scoggins' own concessions at her deposition that she did violate company policies while on FMLA leave, including surreptitiously working while on leave, using another employees' login to do payroll work while on leave, and altering an employee's time record without the proper investigation or documentation, undermine all of her claims.

## II.     Summary Judgment Standard

Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The moving party must initially "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986). Once the moving party meets its burden, the burden shifts to the nonmovant, "who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists" and that summary judgment should not be granted. *Norwegian Bulk Transport A/S v. International Marine Terminals Partnership*, 520 F.3d 409, 412 (5th Cir. 2008); *see also Morris v. Covan World Wide Moving, Inc*., 144 F.3d 377, 380 (5th Cir. 1998).[1]  A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact issue exists will not suffice. *Celotex*, 106 S. Ct. at 2548.  Instead, "the nonmoving party

---

[1] Where "the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim." *Norwegian Bulk Transport A/S v. International Marine Terminals Partnership*, 520 F.3d 409, 412 (5th Cir. 2008).

must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Morris*, 144 F.3d at 380.

In considering a motion for summary judgment, all reasonable inferences to be drawn from both the evidence and undisputed facts are be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986). "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper. *Kelley v. Price- Macemon, Inc.*, 992 F.2d 1408, 1413 (5th Cir. 1993) (citing *Matsushita*, 106 S. Ct. at 1351). On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper." *Id.* Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial." *Anderson*, 106 S. Ct. at 2513.

## III.    ADA

The Americans with Disabilities Act ("ADA") prohibits an employer from discriminating "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). It also prohibits an employer from "discriminat[ing] against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]." 42 U.S.C. § 12203(a).

A plaintiff asserting a disability discrimination claim under the ADA may either present direct evidence of discrimination based on a disability, or utilize the indirect method of proof outlined in *McDonnell Douglas*.  *Caldwell v. KHOU-TV*, 850 F.3d 237, 241 (5th Cir. 2017).  If

proceeding under the indirect method of proof, a plaintiff must establish a *prima facie* case of disability discrimination with evidence that: (1) he or she has a disability, or was regarded as disabled; (2) he or she was qualified for the job; and (3) he or she was subject to an adverse employment decision on account of the disability. *Id.* If that *prima facie* showing is made, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* at 241-42. "The burden then shifts back to the plaintiff 'to produce evidence from which a jury could conclude that the employer's articulated reason is pretextual." *Id.* at 242. This is done with "'evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence.'" *Id.* (quoting *Jackson v. Cal–W. Packaging Corp.*, 602 F.3d 374, 378–79 (5th Cir. 2010)).

A plaintiff asserting a retaliation claim under the ADA must, in the absence of direct evidence, also establish a *prima facie* case of retaliation. This is done by a plaintiff showing that: "(1) she engaged in an activity protected by the ADA, (2) she suffered an adverse employment action, and (3) there is a causal connection between the protected activity and the adverse action." *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 304 (5th Cir. 2020). If such a *prima facie* showing is made, the burden shifts to the defendant to offer a legitimate, non-retaliatory reason for the adverse employment action. *Id.* The burden then shifts back to the plaintiff to "demonstrate that the proffered reason is a pretext for retaliation." *Id.* That burden is met if the plaintiff can "show that 'but for' the protected activity, the adverse employment action would not have occurred." *Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999). "[T]he plaintiff "may avoid summary judgment on 'but for' causation by demonstrating 'a conflict in substantial evidence on this ultimate

issue.'" *Wheat v. Fla. Par. Juv. Just. Comm'n*, 811 F.3d 702, 710 (5th Cir. 2016) (quoting Hernandez v. Yellow Transp., Inc., 670 F.3d 644, 660 (5th Cir. 2012)).

## IV.    FMLA

The Family Medical Leave Act ("FMLA") allows an employee to take a certain amount of unpaid leave for qualifying reasons, and protects employees "from discrimination or retaliation for exercising or trying to exercise their FMLA rights." *Park v. Direct Energy GP, LLC*, 832 F.App'x 288, 293 (5th Cir. 2020). Claims under the FMLA are subject to generally the same burden shifting analysis as other employment discrimination claims.

To establish a *prima facie* case of FMLA interference, a plaintiff must show: "(1) [she] was an eligible employee; (2) [her] employer was subject to FMLA requirements; (3) [she] was entitled to leave; (4) [she] gave proper notice of [her] intention to take FMLA leave; and (5) [her] employer denied [her] the benefits to which [she] was entitled under the FMLA." *Caldwell*, 850 F.3d at 245. "As with the ADA, however, even if the plaintiff makes out a prima facie case, [she] may not overcome a motion for summary judgment if the employer articulates a legitimate non-discriminatory reason for the employment action at issue. To prevail in such a case, the plaintiff must raise an issue of material fact that the employer's proffered reason was pretextual." *Id.* (internal citation omitted). In the FMLA context, pretext is shown with evidence that the employer's reason for the employment action is false or unworthy of credence. *Williams v. Marietta*, No. 20-30549, ___ F.App'x ___, 2021 WL 1521711, at *2 (5th Cir. Apr. 16, 2021) (citing *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000)). An employee's subjective belief that

the employer's proffered reason is false will not raise a genuine issue of material fact on pretext. *Id.* (citing *Price v. Marathon Cheese Corp*., 119 F.3d 330, 337 (5th Cir. 1997)).

A *prima facie* case of FMLA retaliation requires proof that the employee "(1) [ ] engaged in a protected activity; (2) the employer discharged h[er], and (3) there is a causal link between the protected activity and the discharge." *Amedee v. Shell Chem., L.P.*, 953 F.3d 831, 835 (5th Cir. 2020). Once a *prima facie* case has been established, "the burden shifts to the employer to articulate a legitimate, nonretaliatory reason for its decision." *Park*, 832 F.App'x at 295. "Once the employer gives a legitimate reason, the burden shifts back to the plaintiff to provide that the employer's stated reason is a pretext for retaliation." *Id.*[2]

## V.   Discussion

Scoggins was a long-term employee of St. Luke's. She started work there as a radiologic technician in 2002, and in 2011 she became the director of imaging services, a position that had her supervising approximately 50 employees. Shannon Haltom became Scoggins' direct supervisor on January 1, 2017, very shortly before the incidents at issue in this case occurred. Scoggins was approved for, and took, FMLA from February 14, 2017 to March 30, 2017; she returned to work (in

---

[2] It is an open question in this Circuit whether pretext must be proven with "but for" causation or whether a mixed motive causation standard could apply in some circumstances. *See Adams v. Mem'l Hermann*, 973 F.3d 343, 353 (5th Cir. 2020) ("We need not confront that question directly . . . "); *see also Desai v. Invesco Grp. Servs., Inc.*, No. CV H-19-2842, 2021 WL 742889, at *7 (S.D. Tex. Feb. 10, 2021) ("In this period of uncertainty in the law, the Fifth Circuit has held that an FMLA retaliation claim survives summary judgment upon a showing of a conflict of substantial evidence on but-for causation."), *report and recommendation adopted*, No. 4:19-CV-2842, 2021 WL 737124 (S.D. Tex. Feb. 25, 2021).

7

her same position) on March 31, 2017.  She was terminated on July 10, 2017, for violating various company policies, including, working while on leave, using another employee's log-in credentials, and altering an employee's time record without conducting the proper investigation and documentation.

In considering whether there is a genuine issue of material fact on any of Scoggins' claims, the undersigned must first determine whether there is <u>any</u> evidence to support the essential elements of Scoggins' claims; then, if so, the undersigned must consider whether that evidence is disputed, and whether any dispute in the evidence raises a genuine issue of material fact for trial.

**A.     ADA claim**

St. Luke's first argues, in regard to the Scoggins' ADA claim, that Scoggins has not and cannot establish a *prima facie* case of disability discrimination because there is no evidence in the record that she was disabled or regarded as such.

 Disability under the ADA is defined as:

(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment (as described in paragraph (3)).

"Major life activities" are, in turn, defined to include, but not be limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).  An individual can be said to "regarded as" having a disability "if the individual establishes that he or she has been subjected to an action prohibited under this chapter

8

because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."  42 U.S.C. § 12102 (3)(A).

Obesity is not *per se* disabling.  *Lumar v. Monsanto Co.*, 395 F. Supp. 3d 762, 779 (E.D. La. 2019) ("standing alone, the diagnosis of a condition such as morbid obesity is insufficient to trigger the protections of the ADA when it does not limit life activities or work"), *aff'd*, 795 F. App'x 293 (5th Cir. 2020). Instead, to be considered disabling under the ADA, a plaintiff's obesity must "actually and substantially" limit a major life activity.  *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 223 (5th Cir. 2011).  This means that it is for plaintiff to show her obesity actually and substantially limited her ability to perform "a major life activity as compared to most people in the general population." 29 C.F.R. 1630.2(j)(1)(ii).

Here, there is no summary judgment evidence that satisfies Scoggins' burden to show that she has a disability or was regarded by St. Luke's as having a disability.  Scoggins testified at her deposition that her obesity affected her job duties "somewhat" in terms of walking, standing, climbing stairs, lifting, pushing and pulling.  Scoggins Deposition at 40 (Document No. 33 at 18). Nowhere is there evidence from Scoggins, or any other source, that Scoggins was "substantially" limited in any major life activity.  In addition, Scoggins was unable to identify any conduct or comment by anyone at St. Luke's that related to her obesity and/or any physical functioning related thereto.  Scoggins specifically testified at her deposition that she had no idea why Haltom treated her as she had.  Scoggins Deposition at 35 (Document No. 33-1 at 21).

As for Scoggins' after-the-fact characterization of her disability as the recovery period following her surgery on February 14, 2017, during which she was limited in her ability to sit and stand for long periods of time, and had issues eating and sleeping, *see* Scoggins' Deposition at 95

(Document No. 36-3 at 24), that recovery period was transient, and by the time Scoggins returned from FMLA leave on March 31, 2017, she had been released by her doctor with "no restrictions." Scoggins Deposition at 30-31 (Document No. 33-2 at 30-31). That means, at the time of Scoggins' termination, she had no impairment that could constitute a disability under the ADA. "In an ADA case, the relevant time for assessing the existence of a disability is the time of the adverse employment action." *EEOC v. Chevron Phillips Chemical Co.*, LP, 570 F.3d 606, 618 (5th Cir. 2009). In this case, because there is no summary judgment evidence that Scoggins, either at the time she returned from FMLA leave on March 31, 2017, or at the time she was terminated on July 10, 2017, was disabled, or considered as such, she has not established a *prima facie* case of disability discrimination. St. Luke's is therefore entitled to summary judgment on that claim.

As for Scoggins' ADA retaliation claim, while there is summary judgment evidence that Scoggins complained about Haltom and her hostility towards her to both Laurie Green and Kelly Johnson, there is no summary judgment evidence that those complaints were related to any disability discrimination or harassment, and no summary judgment evidence that Haltom's allegedly harassing conduct was related to Scoggins' obesity or her surgical recovery. Scoggins was, at her deposition, unable to identify any comment or behavior on Haltom's part that related to either her obesity or her surgical recovery. Scoggins Deposition at 54-55 (Document No. 33-1 at 29-30). In addition, as set forth above, Scoggins testified at her deposition that she had no idea why Haltom had treated her as she had. Scoggins Deposition at 35 (Document No. 33-1 at 21). With no evidence to link Scoggins' generalized complaints of Haltom's harassment, hostility, belittling and disparagement

10

to any claimed disability, *see* Scoggins' Deposition at 91 (Document No. 33-3 at 35)[3], Scoggins has not established a *prima facie* case of retaliation under the ADA.

On this record, where there is no summary judgment evidence that Scoggins had a disability, was regarded by St. Luke's as disabled, or complained about Haltom's conduct related to a perceived disability, St. Luke's is entitled to summary judgment on Scoggins' claims for disability discrimination and retaliation under the ADA.

---

[3] The following question and answer colloquy at Scoggins' deposition related to her complaints to HR are as follows:

> Q: Did you ever complain to Lori Green that you felt Shannon Haltom harassed you or treated you poorly because of your obesity?
> A: I did not give a specific reason as to why I thought she was doing it, but I complained that she was harassing me and treating me differently.
> Q: Did you ever – well, did you ever complain to Lori Green that you felt that anyone harassed you or treated you poorly because of your obesity?
> A: I don't recall.
> Q: You don't recall ever – a time where you complained to Lori Green about that?
> A: I don't recall one way or another.
> Q: Did Shannon Haltom ever make any comments or statements about your recovery from surgery?
> A: I do not recall one way or the other.
> Q: Did anyone else ever make any comments or statements about your recovery from surgery?
> A: I do not recall one way or another.
>                              * * *
> Q: Did you ever complain to Lori Green that you felt like Shannon Haltom was harassing you or treating you poorly because of your recovery from surgery?
> A: I do not recall one way or the other.
> Q: Did you ever complain to Lori Green that you felt that anyone harassed you or treated you poorly because of your recovery from surgery?
> A: I do not recall one way or the other.

Scoggins Deposition at 91-92 (Document No. 33-3 at 35-36).

### B.      FMLA claim

Pointing primarily to the undisputed summary judgment evidence that Scoggins was approved for FMLA leave and took that leave from February 14, 2017 to March 30, 2017, St. Luke's argues that Scoggins cannot establish a *prima facie* case of FMLA interference.  St. Luke's also argues that Scoggins' own admissions during her deposition that she performed work, surreptitiously and in violation of several company policies, while on FMLA leave, demonstrates, conclusively, that St. Luke's did not interfere with her FMLA leave.  As for the FMLA retaliation claim, St. Luke's argues that because the summary judgment evidence shows, uncontrovertedly, that Scoggins was terminated several months after she returned from FMLA leave, and it was discovered that she had worked while on leave, had used another employee's log-in credentials to do so, and had altered an employee's time record without the proper documentation, Scoggins cannot establish a causal link between her FMLA leave and her termination.  Finally, St. Luke's argues that Scoggins' FMLA claims, which are generally subject to a two-year statute of limitations, are, in any event, time-barred.

As set forth above, it is for Scoggins to establish a *prima facie* case of both FMLA interference and FMLA retaliation.  With respect to the FMLA interference claim, the only element in dispute is whether St. Luke's denied her the benefits to which she was entitled under the FMLA. St. Luke's argues that she was not denied any FMLA benefits because she was approved for FMLA leave and took FMLA leave from February 14, 2017 to March 30, 2017.  Scoggins responds that Haltom, even before her leave was approved, questioned both her need for leave and the type of surgery she was going to have, demonstrating some animus against her and her request for FMLA leave.  Scoggins also points out, and focuses on, the circumstances under which St. Luke's prepared

12

for her leave and its failure to have someone trained to assume her work responsibilities during her leave period.   According to Scoggins, because no one was in a position to assume her job responsibilities (including her payroll responsibilities) on the date she started her FMLA leave, and because St. Luke's knew or should have known her job duties were not covered, she was effectively required or compelled to work while on FMLA leave.   It is here that Scoggins' FMLA claims will succeed or fail.

Requiring an employee to perform significant work duties while on approved FMLA may constitute interference with an employee's FMLA leave.  *Smith-Schrenk v. Genon Energy Services, L.L.C.*, Civil Action No. H-13-2902, 2015 WL 150727 *9 (S.D. Tex. Jan. 12, 2015) ("asking or requiring an employee to do work while on leave can cross the line into interference. . . . By requesting an employee work during FMLA leave, an employer not only discourages the employee from using such leave, but precludes her from using such leave during that period of time.").  De minimis contacts and limited work-related inquiries while an employee is on FMLA is, in contrast, generally not considered FMLA interference.  *Id.*  While the Fifth Circuit has not had occasion to address either the type or extent of work duties that could constitute FMLA interference, it has held that "[g]iving employees the option to work while on leave does not constitute interference with FMLA rights so long as working while on leave is not a condition of continued employment." *D'Onofrio v. Vacation Publications, Inc.*, 888 F.3d 197, 210 (5th Cir. 2018).

Here, there is no dispute in the evidence that Scoggins *did* perform work activities for St. Luke's while on leave.  Those work activities included, most significantly, Scoggins' payroll duties as the director of imaging services.  Scoggins testified at her deposition that she completed her payroll duties "each time that payroll needed to be done while [she was] on FMLA leave" and that

13

she did so by using a subordinate's (Marilyn Washington's) login and password credentials. Scoggins' Deposition at 53; 33-3 at 12.  Scoggins maintains that she <u>had</u> to perform this work because no one had been trained to assume her payroll duties as of February 13, 2017, and her account access to the payroll system had been transferred to the employee (Marilyn Washington) who was supposed to have covered those duties for her while on FMLA leave.  Scoggins Deposition at 11, 21-22 (Document No. 33-2 at 14, 21-22).

Scoggins' deposition testimony is some summary judgment evidence that Scoggins' job duties (including her managerial payroll duties) were not effectively "covered" by another St. Luke's employee at the time of Scoggins' FMLA leave.  That summary judgment evidence, however, even when taken in a light most favorable to Scoggins, does not raise a reasonable inference that Scoggins was *required* to work while on leave "as a condition of continued employment."  *D'Onofrio*, 888 F.3d at 210; *Park*, 832 F. App'x at 294.  Scoggins acknowledged at her deposition that it was up to her to train someone to assume her work duties, including her payroll duties.  Scoggins also admits that as of February 13, 2017, no one had been trained to assume those payroll duties.  Scoggins Deposition at 21-22 (Document No. 33-2 at 21-22).  Regardless of whose fault it was that someone was not trained and in position to perform Scoggins' payroll duties while she was on leave,[4]

---

[4] Scoggins testified at her deposition that she first asked Mercedes Hernandez about whether the accounting department could cover her payroll duties while she was on FMLA leave; Hernandez responded that the accounting department could not cover those duties due to staffing issues.  Scoggins Deposition at 23 (Document No. 36-3 at 8).  In a phone call with Hernandez on February 10, 2017, Scoggins was also told that due to St. Luke's limited number of software licenses, Scoggins' access to the payroll program would have to be disabled and Marilyn Washington's access enabled in order for Washington to perform those payroll duties while Scoggins was on leave.  Scoggins Deposition at 11 (Document No. 36-3 at 2).  That access change was done on February 13, 2017, after Scoggins finished her payroll duties for that payroll period. Scoggins testified that she was unable to train Washington on the payroll duties thereafter because Washington had left for the day, and was unwilling to return.  Scoggins

Scoggins admits that no one at St. Luke's in a managerial or supervisory role knew those duties were not covered.  Scoggins was asked about this at her deposition:

> Q: . . . As of February 13, 2017, did you tell Mercedes Hernandez, or anyone else in payroll, that you had not trained anyone on how to approve employee time entries for payroll?
>
> A: No.
>
>                * * *
>
> Q: When you went on leave, did Shannon Haltom believe that you had assigned all of your duties to one of your subordinates?
>
> A: Yes.

Scoggins Deposition at 23-24 (Document No. 33-2 at 23-24).   Scoggins also admitted at her deposition that no one had asked her to work while on leave, and no one was in a position to know that she was working while on leave:

> Q: . . . Did Shannon Haltom ever tell you that she expected you to do any work while you were on leave?
>
> A: We didn't have that conversation.
>
> Q: So I guess – I guess – so she never told you that she expected you to do any work while you were on leave?
>
> A: She never said one way or the other.
>
>                * * *

---

Deposition at 22 (Document No. 36-3 at 7).  Scoggins also testified that she did not leave any written instructions for Washington and planned on just walking Washington through the process when the time came for Washington to perform the payroll duties.  *Id.*  Instead of walking Washington through the process, Scoggins asked Washington for her login credentials and performed the payroll duties herself throughout the period she was on FMLA leave.  Scoggins Deposition at 52 (Document No. 33-3 at 11).

> Q: . . . I guess my question is, did anyone tell you: Ms. Scoggins, you're going on leave, but you're going to have to do some work while you're on leave?
>
> A: No.

Scoggins Deposition at 14, 15 (Document No. 33-2 at 16, 17).  Scoggins additionally testified that because she was using another employee's log-in credentials, no one was in a position to know that she was working, and performing her payroll duties, while on leave:

> Q: Isn't it true that while you were on leave, you took special care so that Ms. Haltom wouldn't know that you were working, including by directing emails for Martha Harvey and Marilyn Washington to send from their e-mail accounts so that it would not look like you were working?
>
> A: Per the employee's request, that is how it was done.
>
> * * *
>
> Q: And – and why did they request that?
>
> A: So it – it would appear as though they were taking on the responsibility themselves.
>
> Q: And did you tell them that you weren't supposed to be working while you were on leave, and so they should send those e-mails themselves?
>
> A: I don't recall.
>
> * * *
>
> Q: . . . Can you think of any reason that Shannon Haltom would have had to believe that you planned on doing work while you were on leave?
>
> * * *
>
> A: I have no idea.
>
> Q: Is there any reason Lori Green would have had to believe that you planned on doing work while you were on leave?
>
> ***
>
> A: I have no idea.

16

> Q: Is there any reason anyone in St. Luke's management would have had reason to believe that you planned on doing work while you were on leave?

> A: I have no idea.

Scoggins Deposition at 26-27, 29-30 (Document No. 33-2 at 26-27, 29-30).  As for the one phone conference Haltom did ask Scoggins to participate in while she was on leave, that phone conference was a de minimis requirement that would not constitute FMLA interference.  *Smith-Schrenk*, 2015 WL 150727 at *9 ("fielding occasional calls about one's job while on leave is a professional courtesy that does not abrogate or interfere with the exercise of an employee's FMLA rights.").

 Scoggins' own deposition testimony makes it clear that St. Luke's did not know Scoggins was working while on leave, had no reason to know that Scoggins was working while on leave, did not require her to work while on leave, and did not put Scoggins in a position where she was required to work while on leave.  Because there is no summary judgment evidence that St. Luke's "interfered with, restrained, or denied" Scoggins' exercise or attempt to exercise her FMLA rights, and no summary judgment evidence that Scoggins was *required* to perform any work while on leave as a condition of continued employment, Scoggins has not established a *prima facie* claim of FMLA interference.  *See e.g., Park*, 832 F. App'x at 293 (affirming summary judgment on FMLA claim where there was no evidence the employer required the employee "to work during his time off as a condition of continued employment").  St. Luke's is, therefore, entitled to summary judgment on that claim.

As for Scoggins' FMLA retaliation claim, even if Scoggins could establish a *prima facie* case, there is no summary judgment evidence that would raise a genuine issue of material fact on the legitimacy of St. Luke's reason for her termination in July 2017.  St. Luke's terminated Scoggins for violations of several company policies.  While Scoggins disputes some of those policy violations,

17

and argues that she felt compelled to work during her FMLA because no one had been trained to take over all her job responsibilities, Scoggins does not dispute that she altered a subordinate's time-sheet without following St. Luke's rules for documenting and doing so.  Scoggins Deposition at 70, 89 (Document No. 33-3 at 23, 33).   That time-sheet alteration, which St. Luke's has shown with uncontroverted summary judgment evidence was done by Scoggins without the required documentation and investigation, resulted in St. Luke's being sued by the affected employee for unpaid overtime.  *See* Plaintiff's Original Complaint in *Patricia Pace v. The Community Hospital of Brazosport*, Civil Action No. 3:17cv167 (Document No. 33-10).   Because there is no dispute in the evidence that Scoggins altered an employee's time records without the change being communicated to the affected employee (Patricia Pace) or otherwise documented, and because such conduct provided a valid basis under St. Luke's Corrective Action Policy (Document No. 33-5 at 6-9) to support Scoggins' termination, there is simply no summary judgment evidence that Scoggins would not have been terminated "but for" her exercise of her rights under the FMLA.  In the absence of such "but for" evidence, summary judgment is also warranted on Scoggins' FMLA retaliation claim.[5]

---

[5] As argued by St. Luke's, Scoggins' FMLA claims are also time-barred.  FMLA claims are generally governed by a two year statute of limitations.  29 U.S.C. § 2617(c)(1).  That limitations period is extended to three years if there has been a willful violation of the FMLA. 29 U.S.C. § 2617(c)(2).  Here, Scoggins has not come forth with summary judgment evidence that would raise a genuine issue of material fact on her FMLA claims, much less summary judgment that St. Luke's engaged in any willful violation of the FMLA.  *See Henson v. Bell Helicopter Textron, Inc.*, 128 F.App'x 387, 393 (5th Cir. 2005) ("To establish a willful violation of the FMLA, a plaintiff must show that his employer 'either knew or showed reckless disregard for the matter of whether its conduct was prohibited by statute.").  Scoggins' FMLA claims are therefore subject to a two year statute of limitations, which accrued, at the latest, on July 10, 2017, when she was terminated, and expired two years later, before Scoggins filed her Complaint in this case on July 23, 2019.

## VI.    Conclusion and Recommendation

Based on the foregoing and the conclusion that there is no summary judgment that raises a genuine issue of material fact on any of Plaintiff Nichole Scoggins' claims, the Magistrate Judge RECOMMENDS that Defendant's Motion for Summary Judgment (Document No. 32) be GRANTED, and that all of Plaintiff Nichole Scoggins' claims be dismissed with prejudice.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record.  Within fourteen (14) days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), FED. R. CIV. P. 72(b), and General Order 80-5, S.D. Texas.  Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal.  *Thomas v. Arn*, 474 U.S. 140, 144-145 (1985); *Ware v. King*, 694 F.2d 89, 91 (5th Cir. 1982), *cert. denied*, 461 U.S. 930 (1983); *Nettles v. Wainwright*, 677 F.2d 404, 408 (5th Cir. 1982) (en banc).  Moreover, absent plain error, failure to file objections within the fourteen day period bars an aggrieved party from attacking conclusions of law on appeal. *Douglass v. United Services Automobile Association,* 79 F.3d 1415, 1429 (5th Cir. 1996).  The original of any written objections shall be filed with the United States District Clerk.

Signed at Houston, Texas, this 12th day of May, 2021.

Frances H. Stacy
United States Magistrate Judge